[This opinion has been published in *Ohio Official Reports* at 68 Ohio St.3d 435.]

CLARK, ADMR., APPELLANT *v*. SOUTHVIEW HOSPITAL AND FAMILY HEALTH CENTER, APPELLEE.

[Cite as *Clark v. Southview Hosp. & Family Health Ctr.*, 1994-Ohio-519.]

*Hospitals—Physicians and surgeons—Malpractice—Hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners operating in the hosptial, when.*

A hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital when: (1) it holds itself out to the public as a provider of medical services; and (2) in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care. (*Albain v. Flower Hosp.* [1990], 50 Ohio St. 3d 251, 553 N.E.2d 1038, paragraph four of the syllabus, overruled.)

(No. 92-2194—Submitted October 20, 1993—Decided March 16, 1994.)

APPEAL from the Court of Appeals for Montgomery County, Nos. 12845 and 13060.

———————————

{¶ 1} At approximately 6:00 a.m. on the morning of August 25, 1986, twenty-six-year-old Kimberly Sierra arrived at the emergency room at appellee Southview Hospital and Family Health Center ("Southview") suffering from an asthma attack.  She drove to the hospital with her eighteen-month-old daughter from her house in West Carrollton.  The most direct route from Kimberly's house to Southview would have taken her directly past Sycamore Hospital.  Kimberly was pronounced dead at 11:16 a.m. that morning at Southview, allegedly as a proximate result of negligent medical care provided by Dr. Thomas Mucci, D.O., the emergency-room physician on duty at Southview.

**{¶ 2}** At that time, Dr. Mucci was president and sole shareholder of TMES, Inc. ("TMES"). Pursuant to an agreement in effect on August 25, 1986 between TMES and Dayton Osteopathic Hospital, d.b.a. Southview, TMES was obligated to provide qualified physicians to staff the emergency department at Southview twenty-four hours per day. The agreement provided that "[t]he relationship between [Southview and TMES] shall be that of independent contractor."

**{¶ 3}** On August 21, 1987, Kimberly's mother, appellant Edna K. Clark, administrator of Kimberly's estate, filed a complaint, later amended, in the Montgomery County Court of Common Pleas, which alleged, in part, the wrongful death of Kimberly as a result of medical negligence on the part of Southview through its agents and/or employees, Dr. Mucci and TMES. It is undisputed that prior to trial, appellant settled her claims against Dr. Mucci and TMES, and dismissed these defendants from the case.

**{¶ 4}** On April 16, 1991, the case proceeded to trial by jury against Southview. During her case-in-chief, appellant testified that on the morning of August 25, 1986, while vacationing in South Carolina, she received a telephone call from her aunt who told her that Kimberly was in the hospital and in critical condition. Although her aunt did not know what hospital Kimberly was in, appellant immediately telephoned the emergency room at Southview because she knew that Kimberly would go there if she had any control of herself at the time. Appellant had told her daughter that if she ever encountered any problems, appellant wanted her to go to Southview because it had doctors on duty there twenty-four hours a day. Prior to August 25, 1986, appellant had been told by the administrative department at Southview that "the hospital had doctors there twenty-fours hours a day in their emergency room and [that] they were fully equipped." As a result of this statement, and having read various promotional and marketing materials concerning the services that were available at Southview, appellant believed that the emergency-room physicians at Southview "worked for the hospital

2

[and] were hospital doctors." She told Kimberly "the same thing that I believed [about the physicians] from the first time I was ever in the emergency room at Southview." At no time was appellant informed to the contrary.

{¶ 5} The promotional and marketing materials of Southview which were admitted into evidence consisted of various pamphlets, brochures and an "Emergency Handbook & Physician Directory." Also admitted into evidence were various newspaper advertisements and the contents of radio and television advertisements. As relevant here, the promotional literature contains statements such as: "We welcome the opportunity to serve our community in this way, to supplement our full range of inpatient and outpatient medical care"; "You'll find facts about the hospitals' emergency departments"; "Southview ***feature[s] attractive new emergency department[] with the latest technology and equipment [which] can handle all major medical emergencies"; "At***Southview's emergency department[], we treat whole people, not just diseases and traumatic injuries"; "Get more information about our emergency facilities"; "Paramedics call the emergency department from the scene, and by the time the patient is stabilized and brought to the hospital, the surgical team is ready"; "Southview Hospital[] provide[s] the full range of patient care"; and "Our business is your good health, not just the cure of ill health." The promotional literature does not reveal the existence of TMES or the fact that the emergency department at Southview is staffed by independent physicians under a contract.

{¶ 6} At the conclusion of appellant's evidence, and again at the close of all the evidence, Southview moved for a directed verdict on the issue of agency by estoppel, which motion the trial court denied.

{¶ 7} At the conclusion of the trial, the jury returned a general verdict in favor of appellant in the amount of $1,004,603.94. In its answers to interrogatories, the jury found that Southview had made representations, both directly and indirectly, leading Kimberly to believe that Dr. Mucci was an agent or employee of

Southview, and that Kimberly had thereby been induced to rely upon that relationship to seek emergency services at Southview on August 25, 1986. Judgment was entered on the verdict in the amount of $729,603.94, reflecting a setoff of the $275,000 received by appellant in her settlement with Dr. Mucci and TMES.

{¶ 8} The court of appeals reversed the judgment of the trial court, finding that a directed verdict should have been granted in Southview's favor, and entered judgment for Southview. The court found in part that reasonable minds could not conclude from the evidence that Dr. Mucci or TMES was an apparent agent of Southview.

{¶ 9} The cause is now before this court pursuant to the allowance of a motion to certify the record.

_____

*Stocklin & Simpson Co., L.P.A.*, *Valerie Stocklin* and *Jay M. Simpson*, for appellant.

*Freund, Freeze & Arnold*, *Neil F. Freund* and *Mary E. Lentz*, for appellee.

*Bricker & Eckler*, *James J. Hughes, Jr.*, and *Catherine M. Ballard*, urging affirmance for *amicus curiae*, Ohio Hospital Association.

*Wolske & Blue* and *Michael S. Miller*, urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 10} We must determine whether the trial court should have directed a verdict in favor of Southview on the issue of agency by estoppel.

{¶ 11} Civ. R. 50(A)(4) provides that:

"When a motion for a directed verdict has been properly made, the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable

4

minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

"By the same token, if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O. 3d 243, 244, 363 N.E.2d 367, 368.

**{¶ 12}** Generally, an employer or principal is vicariously liable for the torts of its employees or agents under the doctrine of *respondeat superior*, but not for the negligence of an independent contractor over whom it retained no right to control the mode and manner of doing the contracted-for work. *Councell v. Douglas* (1955), 163 Ohio St. 292, 295-296, 56 O.O. 262, 263-264, 126 N.E.2d 597, 599-600.

**{¶ 13}** This issue was addressed in *Albain v. Flower Hosp.* (1990), 50 Ohio St. 3d 251, 553 N.E.2d 1038. At paragraph four of the syllabus in *Albain*, this court recognized and adopted the following exception to hospital nonliability for the negligence of independent contractors:

"A hospital may, in narrowly defined situations, under the doctrine of agency by estoppel, be held liable for the negligent acts of a physician to whom it has granted staff privileges. In order to establish such liability, a plaintiff must show that: (1) the hospital made representations leading the plaintiff to believe that the negligent physician was operating as an agent under the hospital's authority, and (2) the plaintiff was thereby induced to rely upon the ostensible agency relationship."

**{¶ 14}** In attempting to apply *Albain* to the facts of this case, we find ourselves questioning the very basis of the holding in paragraph four of the syllabus. Concomitantly, we are not unmindful of the doctrine of *stare decisis* which dictates adherence to judicial decisions. *Stare decisis*, however, was not

intended "to effect a 'petrifying rigidity,' but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it." *Bing v. Thunig* (1957), 2 N.Y. 2d 656, 667, 163 N.Y.S. 2d 3, 11, 143 N.E.2d 3, 9.

**{¶ 15}** With the foregoing in mind, we now proceed to reconsider the holding in *Albain* as it is applicable to the instant case. In adopting an agency-by-estoppel exception, we noted in *Albain* that the majority of jurisdictions which have recognized this type of hospital vicarious liability has done so based on either Section 267 of the Restatement of the Law 2d, Agency (1958) 578, or Section 429 of the Restatement of the Law 2d, Torts (1965) 421. In adopting Section 267, we stated that "Section 267 poses a stricter standard, and requires actual reliance***." *Id.* at 262, 553 N.E.2d at 1048-1049.

**{¶ 16}** We then proceeded to narrowly define the situations to which the doctrine could apply, without any discussion or analysis of how the multitude of cases from other jurisdictions has applied Sections 267 or 429 to vicarious hospital liability. Rather, based on a law review, Comment, Hospital Liability for Physician Malpractice: The Impact of *Hannola v. City of Lakewood* (1986), 47 Ohio St. L.J. 1077, and a severely criticized dissenting opinion in *Pamperin v. Trinity Mem. Hosp.* (1988), 144 Wis.2d 188, 423 N.W.2d 848, we limited the doctrine in a way that simultaneously abrogated the very exception we claimed to create.

**{¶ 17}** We began our analysis in Albain with the statement that the doctrine of agency by estoppel was first applied to hospitals in *Grewe v. Mt. Clemens Gen. Hosp.* (1978), 404 Mich. 240, 250-251, 273 N.W.2d 429, 433, as follows:

"'[I]f the individual looked to the hospital to provide him with medical treatment and there has been a representation by the hospital that medical treatment would be afforded by the physicians working therein, an agency by estoppel can be found.'" *Albain*, 50 Ohio St.3d at 262, 553 N.E.2d at 1048.

**{¶ 18}** We then used this language to form the basis of what we set forth as the first element required under paragraph four of our syllabus, *viz.*, that the plaintiff must show that the hospital made representations leading her to believe that the negligent physician was operating as an agent under the hospital's authority. *Id.* at 263, 553 N.E.2d at 1049.

**{¶ 19}** A close reading of the *Grewe* opinion, however, reveals that the above passage was not meant to summarize what we articulated as the first prong of agency by estoppel. Rather, it was advanced as the total set of requirements imposed upon a plaintiff relying on the doctrine to establish liability of the hospital. In the very next paragraph, the court in *Grewe* explained that:

"[T]he critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems. A relevant factor in this determination involves resolution of the question of whether the hospital provided the plaintiff with [the treating physician] or whether the plaintiff and [the treating physician] had a patient-physician relationship independent of the hospital setting." *Id.*, 404 Mich. at 251, 273 N.W.2d at 433.

**{¶ 20}** In applying this test, *Grewe* recognized that it is not the patient/plaintiff's duty to inquire as to the employment relationship between the hospital and the physician it provides. Rather, it is the hospital's duty "'to put [plaintiff] on notice that the [treatment was not rendered as] an integral part of [the hospital], and it cannot be seriously contended that [plaintiff], when he was being carried from room to room suffering excruciating pain, should have inquired whether the individual doctors who examined him are employees***or***independent contractors.'" *Id.* at 253, 273 N.W.2d at 434, quoting *Stanhope v. Los Angeles College of Chiropractic* (1942), 54 Cal. App.2d 141, 146, 128 P.2d 705, 708.

{¶ 21} Yet, in direct contrast to the very case we relied upon in adopting paragraph four of our syllabus in *Albain*, we proceeded to reject plaintiff's averment in *Albain* that upon her arrival at the hospital she believed "that [the hospital] would provide me with a physician." We found that plaintiff "did not believe that a physician *who was an employee of the hospital* would be provided her" because the treating physician "never discussed her employment status with [plaintiff] in any manner." (Emphasis *sic*.) *Id.* at 264, 553 N.E.2d at 1050.

{¶ 22} We also added a second element--that the plaintiff must show that she was induced to rely upon the apparent-agency relationship. In fact we applied this element in a way that is contrary to the holding of cases in all other jurisdictions that we have found which adopted and applied the doctrine in actions against hospitals. See discussion *infra*.

{¶ 23} We stressed that "[a]s to this second element *** the question is *** *not* whether the plaintiff relied on the reputation of the hospital." (Emphasis *sic*.) *Id.* at 263, 553 N.E.2d at 1049-1050. Rather, the plaintiff must demonstrate that she "would have refused *** care if she had known [that the treating physician] was not an employee of the hospital." *Id.* at 264, 553 N.E.2d at 1050.

{¶ 24} By requiring the patient/plaintiff in *Albain* to demonstrate that she would have refused care had she known of the independent status of the treating physician, we have created an exception that is so illusory that it forces the emergency patient to demonstrate that she would have chosen to risk further complications or death rather than be treated by a physician of whose independence she had been unaware. In addition, *Albain* imposed the burden that the patient ascertain and understand the contractual arrangement between the hospital and treating physician, while simultaneously holding that her belief upon arrival that the hospital would provide her with a physician is insufficient. Thus it is virtually impossible for the plaintiff, especially in a wrongful-death case, to establish reliance as required in *Albain*.

**{¶ 25}** It is no wonder that among the many cases from other jurisdictions dealing with this issue, we were unable to find a single case in support of such a narrow interpretation of agency by estoppel in a hospital setting. In fact, *Albain* is so much an aberration that its requirements, proposed elsewhere, have been called "astonishing," "absurd," "unfair," criticized for creating a "false dichotomy" between reliance on the apparent agency relationship and the hospital's reputation, and scoffed at for focusing on notice that comes "too little, too late." *Paintsville Hosp. Co. v. Rose* (Ky. 1985), 683 S.W.2d 255, 258; *Capan v. Divine Providence Hosp.* (1980), 287 Pa. Super. 364, 369, 430 A.2d 647, 649; Note, *Pamperin v. Trinity Mem. Hosp.* and the Evolution of Hospital Liability: Wisconsin Adopts Apparent Agency (1990), Wis. L.Rev. 1129, 1147, 1148.

**{¶ 26}** Appellant, in conciliatory fashion, proposes that in the event that we choose not to reexamine *Albain*, we can find evidence of reliance in the fact that Kimberly drove directly by Sycamore Hospital in order to be treated at Southview. If we were to do as appellant suggests, then the outcome would be different had she suffered the asthma attack at a place geographically closer to Southview than to Sycamore Hospital. It is disconcerting at best that the fortuity of geographic proximity should determine the outcome under a doctrine so deeply rooted in public policy.

**{¶ 27}** Because of the history surrounding the growth of hospital liability and strong public policy arguments, we choose to revisit paragraph four of the syllabus of *Albain*. At common law, hospitals enjoyed immunity from liability even for the negligent acts of their employees. The concept is said to have originated in mid-Nineteenth Century England and was based on the theory that charitable funds could not be diverted from the use intended by their donors. American courts imported the "trust fund" theory and added others to justify the exemption of hospitals from tort liability, even long after the theory was discarded in England. The other theories included implied waiver, public policy and the idea

that *respondeat superior* is not appropriate because the hospital derived no benefit from the physician's services. See, generally, Note, Independent Duty of a Hospital to Prevent Physicians' Malpractice (1973), 15 Ariz. L.Rev. 953, 954-956. As one court has stated:

"[S]ince [a hospital] ministers to those who cannot pay as well as those who can, thus acting as a good Samaritan, justice and sound public policy alike dictate that it should be exempt from the liability attaching to masters whose only aim is to engage in enterprises of profit or of self-interest***." *Morrison v. Henke* (1917), 165 Wis. 166, 170-171, 160 N.W. 173, 175 (overruled by *Kojis v. Doctors Hosp.* [1961], 12 Wis.2d 367, 107 N.W.2d 131).

**{¶ 28}** This court first applied the doctrine of charitable immunity to hospitals in *Taylor v. Protestant Hosp. Assn.* (1911), 85 Ohio St. 90, 96 N.E. 1089, relying on each of the aforementioned justifications. In summary, we made the following predictive observation:

"Experience has shown that the ends of justice are best secured by holding the master responsible for injuries caused by the wrongful acts of his servant done in the prosecution of his private ends and for his benefit.

"Doubtless the rule will be extended to meet the requirements of manifold new conditions brought about by growth and advance. Courts are constantly confronted with the necessity of extending established principles to new conditions. But in this case it is sought to extend the rule to masters different from others and who do not come within its reason, and to hold a public charity involving no private profit responsible for the negligence of servants employed solely for a public use and a public benefit. We think such extension is not justified. Public policy should and does encourage enterprises with the aims and purposes of defendant and requires that they should be exempted from the operation of the rule" *Id.* at 103, 96 N.E. at 1092.

**{¶ 29}** Indeed, our reasoning was painfully reflective of the realities of the time:

"The hospital of the early mid-nineteenth century would not be recognizable as such to a modern observer. 'Respectable' people who fell sick or who were injured were treated by their doctors at home; only the lowest classes of society sought help in the 'hospital,' which was most often a separate wing on the almshouse. As late as 1873, there were only 178 hospitals in the United States, with a total of 50,000 beds. These hospitals were private charities, and their trustees were usually unable to raise sufficient funding to provide a pleasant stay. The hospital of the time was dirty, crowded and full of contagious disease. The 'nurses' were usually former patients. Doctors, who were not paid, tended the ill for a few hours per week out of a sense of charity mixed with the knowledge that they could 'practice' their cures on the poor and charge young medical students for instruction in the healing arts. These young 'house doctors' also worked without pay, practicing cures on the ill." Note, *supra*, 1990 Wis. L.Rev. at 1131.

**{¶ 30}** As the role of the hospital in society changed, the justifications underlying charitable immunity eroded. At first, courts drew a distinction between medical and administrative acts of employees, imposing liability on the hospital for the latter but not the former. See *Schloendorff v. Soc. of New York Hosp.* (1914), 211 N.Y. 125, 105 N.E.92. This distinction represented a judicial policy of compromise between the doctrines of *respondeat superior* and charitable immunity. See *Bing v. Thunig*, *supra*, at 662, 163 N.Y.S.2d at 7, 143 N.E.2d at 6. In *Bing*, however, it was observed that liability based on *respondeat superior* is the rule and immunity the exception. *Id.* at 666, 163 N.Y.S. 2d at 10, 143 N.E.2d at 8. In abolishing immunity, that court made the following observation:

"The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the

fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility." *Id.* at 666, 163 N.Y.S.2d at 11, 143 N.E.2d at 8.

{¶ 31} This court reached the same conclusion as did *Bing* when, in *Avellone v. St. John's Hosp.* (1956), 165 Ohio St. 467, 60 O.O. 121, 135 N.E.2d 410, we abolished the doctrine of charitable immunity for hospitals (later in *Albritton v. Neighborhood Centers Assn.* [1984], 12 Ohio St. 3d 210, 12 OBR 295, 466 N.E. 2d 867, the doctrine of charitable immunity would be abolished altogether in Ohio). We observed that "the average nonprofit hospital of today is a large well run corporation, and, in many instances, the hospital is so 'businesslike' in its monetary requirements for entrance and in its collections of accounts that a shadow is thrown upon the word, 'charity,' and the base of payment mentioned above is broadened still more." *Id.* at 474, 50 O.O. at 125, 135 N.E.2d at 415. Again in predictive fashion, we left open the question as to a hospital's liability for the negligent acts of independent medical practitioners working in the hospital. *Id.* at 477-478, 60 O.O. at 126-127, 135 N.E.2d at 417.

{¶ 32} With the demise of charitable immunity, the issue pushed to the forefront was whether and under what circumstances a hospital could be held liable for the negligence of those independent physicians.

{¶ 33} In *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St. 2d 242, 254, 56 O.O. 2d 146, 152, 272 N.E.2d 97, 104, we declined to apply the doctrine of agency by estoppel to a hospital unless "'induced reliance' [is] shown *** as required by *Johnson v. Wagner Provision Co.* (1943), 141 Ohio St. 584 [26

O.O. 161, 49 N.E.2d 925]." *Johnson* indeed requires "reliance upon an ostensible agency." *Id.* at paragraph four of the syllabus. *Johnson*, however, approved and followed *Rubbo v. Hughes Provision Co.* (1941), 138 Ohio St. 178, 20 O.O. 233, 34 N.E.2d 202. *Id.* at 590, 26 O.O. at 164, 49 N.E.2d at 928. In *Rubbo*, we found the element of reliance to take on a different character where a plaintiff responds to a business advertisement. We held the doctrine of agency by estoppel applicable "[w]here the proprietor of a provision market advertises an article for sale in his market and a purchaser, *in reliance that he was buying from such proprietor and without knowledge to the contrary*, buys such advertised article at a counter in the market which the proprietor had leased to another***." (Emphasis added.) *Id.* at paragraph one of the syllabus.

**{¶ 34}** *Rubbo* imposed no requirement that the plaintiff show induced reliance upon the employment relationship between the proprietor and the lessee. Rather, the focus shifted to reliance upon the relationship between the proprietor's advertisement and the article purchased. In fact, we agreed with the court of appeals in that case that "'prospective purchasers going to the company's place of business had a right to *assume* that the company was selling [the advertised article] in the absence of knowledge to the contrary.'" (Emphasis added.) *Id.* at 181, 20 O.O. at 234, 34 N.E.2d at 204.

**{¶ 35}** Nor does *Rubbo* require proof that representations were made directly to the plaintiff in order for the doctrine to apply. "'[R]epresentations need not be made to the plaintiff directly***[;] "[i]t is sufficient if the representation is made to a third person to be communicated to the plaintiff, or to*** a class of persons of whom the plaintiff is one, or even *if it is made to the public generally with a view to its being acted on*, and the plaintiff as one of the public acts on it ***."'" (Emphasis *sic*.) *Id.* at 182, 20 O.O at 235, 34 N.E.2d at 205, quoting from *Globe Indemn. Co. v. Wassman* (1929), 120 Ohio St. 72, 85, 165 N.E. 579, 583, which was quoting from *Swift v. Winterbotham* (1872-1873), 8 L.R., Q.B. 244.

**{¶ 36}** Courts in other jurisdictions that have addressed the issue of a hospital's liability for the negligence of those with whom it contracts, but over whom the hospital retains no right of control, have adopted the approach of *Grewe* and *Rubbo* with virtual unanimity. Without exception, and irrespective of whether Section 267 of the Restatement of Agency 2d or Section 429 of the Restatement of Torts 2d is utilized, the cases applying this kind of liability do not require an express representation to the patient that the treating physician is an employee of the hospital or direct testimony as to reliance. Rather, the element of representation is satisified when the hospital holds itself out to the public as a provider of medical services, and the element of reliance is satisfied if the patient looks to the hospital, rather than a specific physician, to provide her with medical care. In applying the traditional elements in this way, those courts invariably recognize the status of the modern-day hospital and its role in contemporary society. Not only is the hospital of today a large, well-run business, as we noted in *Avellone* when we abolished charitable immunity for hospitals, but advances in medical technology have inevitably spawned increased specialization and industrialization. Hospitals are the only place where the best equipment and facilities and a full array of medical services are available at any time without an appointment. With hospitals now being complex full-service institutions, the emergency room has become the community medical center, serving as the portal of entry to the myriad of services available at the hospital. As an industry, hospitals spend enormous amounts of money advertising in an effort to compete with each other for the health care dollar, thereby inducing the public to rely on them in their time of medical need. The public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein. Indeed, often the very nature of a medical

emergency precludes choice. Public policy dictates that the public has every right to assume and expect that the hospital is the medical provider it purports to be.

**{¶ 37}** A hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital if it holds itself out to the public as a provider of medical services and in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care. (*Albain v. Flower Hosp.*, *supra*, paragraph four of the syllabus, overruled.) Unless the patient merely viewed the hospital as the situs where her physician would treat her, she had a right to assume and expect that the treatment was being rendered through hospital employees and that any negligence associated therewith would render the hospital liable. *Gilbert v. Sycamore Mun. Hosp.* (1993), WL 421663 (Ill.); *Kashishian v. Port* (1992), 167 Wis.2d 24, 481 N.W.2d 277; *Torrence v. Kusminsky* (1991), 185 W.Va. 734, 408 S.E.2d 684; *Sharsmith v. Hill* (Wyo. 1988), 764 P.2d 667, 671-672; *Pamperin v. Trinity Mem. Hosp.*, *supra*; *Richmond Cty. Hosp. Auth. v. Brown* (1987), 257 Ga. 507, 361 S.E.2d 164; *Hill v. St. Clare's Hosp.* (1986), 67 N.Y.2d 72, 499 N.Y.S. 2d 904, 490 N.E.2d 823; *Brownsville Med. Ctr. v. Garcia* (Tex. App. 1985), 704 S.W.2d 68; *Hardy v. Brantley* (Miss. 1985), 471 So.2d 358; *Paintville Hosp. Co. v. Rose* (Ky. 1985), 683 S.W.2d 255; *Williams v. St. Claire Med. Ctr.* (Ky. App. 1983), 657 S.W.2d 590, 595-596; *Smith v. St. Francis Hosp., Inc.* (Okla. App. 1983), 676 P.2d 279; *Irving v. Doctors Hosp. of Lake Worth, Inc.* (Fla. App. 1982), 415 So. 2d 55; *Themins v. Emanuel Lutheran Charity Bd.* (1981), 54 Ore. App. 901, 637 P.2d 155; *Capan v. Divine Providence Hosp.*, *supra*; *Arthur v. St. Peters Hosp.* (1979), 169 N.J. Super 575, 405 A.2d 443; *Adamski v. Tacoma Gen. Hosp.* (1978), 20 Wash. App. 98, 579 P.2d 970; *Mehlman v. Powell* (1977), 281 Md. 269, 378 A.2d 1121; *Mduba v. Benedictine Hosp.* (1976), 52 A.D. 2d 450, 384 NYS 2d 527; *Schagrin v. Wilmington Med. Ctr., Inc.* (Del. Super. 1973), 304 A.2d 61; *Vanaman v. Milord Mem. Hosp., Inc.* (Del. Super.

1970), 272 A. 2d 718; *Quintal v. Laurel Grove Hosp.* (1964), 62 Cal. 2d 154, 166-168, 41 Cal. Rptr. 577, 584-586, 397 P.2d 161, 168-170; *Seneris v. Haas* (1955), 45 Cal. 2d 811, 291 P.2d 915; *Stanhope v. Los Angeles College of Chiropractic* (1942), 54 Cal. App. 2d 141, 128 P.2d 705. See, also, Annotation, Liability of Hospital or Sanitarium for Negligence of Physician or Surgeon (1987), 51 A.L.R. 4th 235, 271-276, Section 7; Comment, Medical Malpractice by Emergency Physicians and Potential Hospital Liability (1986-1987), 75 Ky. L.J. 633; Southwick, Hospital Liability: Two Theories Have Been Merged (1983), 4 J. Legal Med. 1; Levin, Hospital's Liability for Independent Emergency Room Service (1982), 22 Santa Clara L. Rev. 791; Note, Judicial Recognition of Hospital Independent Duty of Care to Patients: *Hannola v. Lakewood* (1981), 30 Cleve. St. L.Rev. 711; Note, Independent Duty of a Hospital to Prevent Physicians' Malpractice (1973), 15 Ariz. L. Rev. 953.

{¶ 38} As to notice to the plaintiff that care is being provided by independent medical practitioners, we stress that such notice, to be effective, must come at a meaningful time.[1]

{¶ 39} A review of the record in this case reveals substantial competent evidence upon which reasonable minds could conclude, as the jury did, that

---

1. It has been suggested, particularly by the dissent in *Pamperin v. Trinity Mem. Hosp.*, *supra*, 144 Wis. 2d at 217-218, 222, 423 N.W.2d at 860, 861, that hospitals could escape liability for the negligence of their independent contractors by posting signs in their emergency rooms regarding the legal relationship of persons rendering medical assistance. The dissent, however, misconstrues the concept of notice. Such "notice" will rarely provide the patient with the ability to choose at a meaningful time:

"The plaintiff, who by definition is injured and under stress, is relying upon the hospital to provide the services that the hospital has held out that it can provide. The plaintiff's reliance upon the hospital's competence has been demonstrated by her walking (or being wheeled) into the emergency room. Simply informing her that some doctors and staff have a different technical relationship with the hospital than the one she expected does not lessen the reasonableness of her reliance upon the hospital. Even if the patient understood the difference between an employee and an independent-contractor relationship, informing her of the nature of the relationship after she arrives is too late. The purpose of any notice requirement is to impart knowledge sufficient to enable the plaintiff to exercise an informed choice. The signs suggested by the dissent are too little, too late." Note *supra*, 1990 Wis. L. Rev. at 1147.

Southview is estopped from denying that Dr. Mucci was its employee on August 25, 1986. By its representation to Kimberly's mother and its promotional campaign, Southview held itself out as a provider of a full range of medical services, including emergency care. There is nothing in the record to indicate that Kimberly was informed or knew that the emergency care she received was being rendered by an independent contractor merely using the hospital as a situs to provide such care. Rather, appellant's testimony indicates that Kimberly was looking to Southview to provide such care.

{¶ 40} For all the foregoing reasons, the judgment of the court of appeals is reversed, and the judgment of the trial court entered upon the verdict is reinstated.

*Judgment reversed.*

DOUGLAS, F.E. SWEENEY, and PFEIFER, JJ., concur.

MOYER, C.J., A.W. SWEENEY and WRIGHT, JJ., dissent.

———————————

**MOYER, C.J., dissenting.**

{¶ 41} I respectfully dissent. In its attempt to mitigate the perceived harshness of *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 553 N.E.2d 1038, the majority swings the pendulum so far to the other side as to make a hospital the virtual insurer of its independent physicians.

{¶ 42} In *Albain*, this court held that a hospital may be found liable for the acts of its staff physicians under the doctrine of agency by estoppel. *Id.* at paragraph four of the syllabus. To establish such liability, *Albain* required the plaintiff to prove that "(1) the hospital made representations leading the plaintiff to believe that the negligent physician was operating as an agent under the hospital's authority, and (2) the plaintiff was thereby induced to rely upon the ostensible agency relationship." In my view, the instant case presents a set of facts that could be found to satisfy the *Albain* test for agency by estoppel and demonstrates that there is no need to overrule paragraph four of the *Albain* syllabus.

**{¶ 43}** As the majority points out, the evidence in this case established that Southview Hospital, through its advertising materials, held itself out as a hospital with an emergency room that possessed "the latest technology and equipment" and that could "handle all major medical emergencies." Prior to her medical emergency, plaintiff had made a specific decision to go to the Southview Hospital emergency room if she were to have a medical crisis. She apparently passed directly by a closer hospital on her way to Southview. As I read *Albain*, a reasonable trier of fact could have, based on this and other evidence at trial, found Southview liable through agency by estoppel.

**{¶ 44}** Instead, the majority overrules paragraph four of the *Albain* syllabus and substitutes a new test for agency by estoppel. Thus, a majority of the court persists in its eagerness to overrule recent and well-reasoned precedent. The court justifies its departure from the doctrine of *stare decisis* in this case by implying that the standards enunciated in *Albain* will lead to "unfairness, *** doubt and confusion."

**{¶ 45}** At a time when the rising cost of medical care surpasses most other issues on national agendas, a majority of this court has acted to substantially increase the acts of doctors for which hospitals will be required to provide insurance. The test the majority has established will unfortunately increase the cost of providing medical services and create more unfairness, doubt and confusion than it resolves. Numerous questions arise when one tries to analyze and predict the consequences of the newly announced standard. For example, what does it mean for a hospital to "hold itself out" to the public as a provider of medical services? Does not every medical hospital do so when it erects a sign saying "hospital" on its premises? The majority cites approvingly to *Rubbo v. Hughes Provision Co.* (1941), 138 Ohio St. 178, 20 O.O. 233, 34 N.E.2d 202, for the proposition that the hospital need only make a representation to "a class of persons of whom the plaintiff is one." Does this require that the plaintiff even be aware of the representation?

Does the "holding out" of the hospital require any specific representations about the emergency room?

**{¶ 46}** As to the second prong of the newly announced test, what constitutes "notice or knowledge to the contrary?" The majority has indicated that a sign in the emergency room is not sufficient. Will disclaimers in the hospital's brochures and advertisements be sufficient? Will a hospital be able to insulate itself by promoting, for instance, "the excellent care provided by its *independent* staff physicians?"

**{¶ 47}** In addition, the final element of the majority's new test, which requires that the plaintiff look to the hospital as opposed to the individual physician to provide competent care, is entirely subjective. Once a plaintiff testifies that he or she "looked to the hospital" as opposed to the individual practitioner, a hospital defendant will have almost no effective means to disprove the plaintiff's subjective state of mind. The majority criticizes *Albain* for requiring the plaintiff to prove reliance in a wrongful death case, stating that it would be "virtually impossible." The newly announced test, however, which depends exclusively on the decedent's state of mind at the time he or she received medical care, presents the very same problem of proof. Finally, to what extent must the plaintiff's "looking to the hospital" be a direct result of the hospital's representations as opposed to the plaintiff's ambient information—or disinformation—about how hospitals are structured and operate in general?

**{¶ 48}** More doubt and confusion will arise when the majority's holding is applied in other factual settings. For example, some large department stores rent space in their stores to purveyors of individual lines of products, such as cosmetics. In doing so, does a department store hold itself out to the public as a "provider" of cosmetics, subjecting it to liability for the negligent acts of the independent contractors on its premises?

**{¶ 49}** The majority asserts, and I agree, that *stare decisis* should not prevail when precedent leads to injustice and unfairness. I also agree that the role of hospitals in society has changed dramatically over time. Nevertheless, I do not agree that merely because hospitals have come more to resemble businesses than charitable institutions, this court should dramatically weaken their ability to limit contractually their liability for their independent agents. This court should not force hospitals to be excess insurers of their staff physicians. Nor has plaintiff shown that, in the great majority of malpractice cases, the physician's insurance will be inadequate to cover the full amount of damages.

**{¶ 50}** Estoppel is an equitable doctrine that, according to Black's Law Dictionary (6 Ed.1990) 551, mandates that "[a] party is prevented by his own acts from claiming a right to detriment of other party who was entitled to rely on such conduct and has acted accordingly." (Citing *Graham v. Asbury* [1975], 112 Ariz. 184, 185-186, 540 P.2d 656, 657-658.) It is a doctrine rooted in considerations of fairness that prevents a party from benefiting from a representation, and later denying it. By requiring reliance, the *Albain* test properly embodied this concept. By eliminating the need for a nexus between the representation and a specific act by the plaintiff in reliance thereon, the new standard loses sight of the basis for applying estoppel in the first place. The new standard penalizes a hospital where it has reaped no benefit from its own actions.

**{¶ 51}** The essence of the problem in these cases is the tension between making hospitals liable in all instances and making them liable in none. The majority criticizes *Albain* because it "abrogated the very exception [it] claimed to create." The fact that the instant case may be decided favorably to the plaintiff under Albain, however, demonstrates otherwise. Moreover, I believe that the majority has committed the same fault to the opposite extreme: it has created a rule that swallows the exception.

20

**{¶ 52}** If the *Albain* standard unduly limits the class of potential plaintiffs, the more jurisprudentially sound approach would be to modify, interpret or soften the holding of that case instead of conducting the radical surgery performed by the majority opinion. For example, this court could choose not to follow the dicta in *Albain* that the plaintiff prove that he or she would have refused treatment had he or she known of the agency relationship. 50 Ohio St.3d at 264, 553 N.E.2d at 1050. This is the difference between the incremental development of the common law and judicial legislation. In a time of ever-increasing medical costs and potentially drastic changes to our health care system, this court would do well to take caution in its radical redistribution of liabilities for acts of medical malpractice.

A.W. SWEENEY and WRIGHT, JJ., concur in the foregoing dissenting opinion.

_____

**WRIGHT, J., dissenting.**

**{¶ 53}** My former colleague, Justice Ralph Locher, certainly said it right. The battle cry in this era of burgeoning litigation is "*sue, sue, sue*!"[2]  "Deep pocket" suits are upon us but for little purpose.

**{¶ 54}** The majority's pejorative description of *stare decisis* as ""petrifying rigidity,"" in this particular context defies comment.  I say this because the precedent overturned today merely states that if a hospital employs an intern, resident or any other medical practitioner, it must answer in damages for their actions on the job.  Conversely, if a doctor is working as an independent contractor within a hospital *and* the medical facility *does not hold itself out as that doctor's employer*, the hospital should not be joined in an action for malpractice against the doctor.  Today, the majority rejects this precedent.

**{¶ 55}** From this day on no malpractice action evolving out of an incident within a hospital will be brought without joining the medical facility as a co-defendant and this will include the costs of defense attendant thereto.

**{¶ 56}** In this period of burgeoning costs to the medical consumer the majority has surely taken a step backwards.

**{¶ 57}** I concur in the Chief Justice's commentary and vigorously dissent.

---

2.  See Justice Locher's dissent in Nottingdale Homeowners' Assn., Inc. v. Darby (1987), 33 Ohio St.3d 32, 37, 514 N.E.2d 702, 707.