OPINION
Plaintiff-appellant, Luceva Fetters,[1] appeals the judgment entered by the Hamilton County Court of Common Pleas in favor of defendants-appellees, St. Francis/St. George Hospital and Dr. S. Zubair Haq, in a medical malpractice case. For the following reasons, we reverse the trial court's judgment and remand the cause for a new trial.
For many years, ninety-one-year-old Sudie Reed suffered from periodic fainting spells. The spells were brought on by what is described in the record as sick sinus syndrome, meaning that, periodically, Reed's heart would beat too slowly. Between 1988 and 1996, Reed had been admitted to a hospital emergency room on several occasions because she had fainted and fallen.
On May 13, 1996, Reed experienced a fainting episode, during which she fell and injured her shoulder. The following day, her granddaughter took her to the emergency room of St. Francis/St. George. It is undisputed that St. Francis/St George was chosen because it was the hospital nearest to where Reed resided with her daughter, Fetters.
At the emergency room, it was determined that Reed had broken her shoulder as a result of the fall. Further examination revealed that Reed had fluid on her lungs. She was admitted to the hospital and was examined by the cardiologist on call, Dr. S. Zubair Haq.
Because Reed's family physician, Dr. Martinez, was licensed only in Kentucky, he referred her to Dr. Alvin Huesman. According to St. Francis/St. George, Dr. Huesman, in turn, selected Dr. Haq to treat Reed. Reed executed several hospital forms that stated,inter alia, that the physicians practicing at St. Francis were not its employees.
Dr. Haq determined that Reed was a proper candidate for a permanent pacemaker operation. By inserting this device into Reed, Dr. Haq intended to regulate her heart, thereby reducing the risk of further fainting episodes and the resulting falls.
The pacemaker implantation procedure began at 9:45 a.m. on June 3, 1996, three weeks after Reed's admission to St. Francis/St. George. The procedure required Dr. Haq to thread the pacemaker leads, the ends of which were tined, through the ventricle and place them in contact with the heart wall. Because he could not properly position the leads, Dr. Haq withdrew them several times and reinserted them. Dr. Haq did not realize until about ten minutes after the final reinsertion that he had perforated the right ventricle of Reed's heart during the insertion procedure.
At 10:30 a.m., Dr. Haq noted that Reed's systolic blood pressure had dropped from 180 to 90, and that her heart rate had lowered to thirty beats per minute. He suspected that he had perforated the heart and that Reed was suffering from tamponade, a condition in which the pericardium sac around the heart fills with blood and impedes the heart's ability to pump blood through the body. An echocardiogram and a Swan-Ganz catheter both confirmed tamponade.
At approximately 11:20 a.m., Dr. Haq summoned another cardiologist, Dr. Mark Workman, and a thoracic-cardiovascular surgeon, Dr. Saeed Esmaili, to the catheterization lab, where the pacemaker was being implanted.[2] Dr. Haq informed the other physicians that he had perforated the ventricle and that his attempts at pericardiocentesis[3] were unsuccessful. At 11:30, Dr. Esmaili also performed pericardiocentesis, and, on his second attempt, he drained some dark red blood from the heart. Dr. Esmaili also inserted a catheter into the heart. However, Dr. Haq told Dr. Esmaili to remove it because Dr. Haq did not think that it was in the pericardium. At 11:40, Dr. Esmaili instructed Dr. Haq to perform another echocardiogram in thirty minutes and to call him if Reed's condition deteriorated. Esmaili then left to perform a previously scheduled surgery on another patient.
At 1:30 p.m., Dr. Haq alerted Dr. Esmaili that he was sending Reed to surgery. Dr. Haq testified at trial that the reason he did not send Reed to surgery earlier was because he mistook the pressure readings in Reed's heart to be normal when in fact they were not. Additionally, the record reveals that Reed had briefly stopped breathing at 11:20 and was revived with oxygen.
Despite these circumstances, Dr. Haq did not check the oxygen levels of Reed's blood until 12:50. At that time, she had a pH level of 7.1 due to the fact that the tamponade condition was preventing the blood from being properly oxygenated, a condition described in the record as acidosis. By the time that Reed was taken to surgery, her blood pH level had dropped to 6.9. According to an expert witness, Dr. Thomas O'Grady, only five percent of patients with that pH level can be resuscitated.
Dr. Esmaili received Mrs. Reed in the operating room at approximately 2:00 p.m. He first performed a procedure known as a pericardial window and was able to drain one hundred cubic centimeters of blood away from the heart. At that time, the bleeding stopped, and Mrs. Reed's blood pressure began to rise.
Unfortunately, the bleeding resumed, and Dr. Esmaili attempted to stop it by placing pressure with his hand directly on the heart. When this failed, Dr. Esmaili opened Reed's chest bone and exposed the heart. He then tried to suture the perforation, but the sutures would not hold, and the wound continued to bleed. Reed's blood pressure continued to drop, and her heart went into fibrillation and stopped. According to Dr. O'Grady, the fibrillation was brought on by the acidotic condition.
Fetters initiated this medical malpractice action against Dr. Haq and Dr. Esmaili on January 24, 1997. She also sued St. Francis/St George under a theory of vicarious liability, as well as negligent failure to supervise the physicians that had rendered care to Reed. The matter proceeded to a jury trial beginning in April 1999.
At the conclusion of Fetters's case-in-chief, St. Francis/St. George moved for a directed verdict. The trial court granted the motion, and the case proceeded against the only remaining defendant, Dr. Haq. The jury returned a verdict in favor of Dr. Haq, and judgment on that verdict was entered on May 18, 1999.
In this timely appeal,[4] Fetters asserts four assignments of error. In her first assignment of error, she argues that the lower court erred by overruling her motion to exclude the opinion of Dr. Haq's expert witness concerning Reed's cause of death, or, in the alternative, by overruling her motion for a mistrial. She contends that counsel's failure to inform her of the change in the expert's opinion between the time of his deposition and the date of trial rendered the trial unfair. We find this argument to be persuasive.
Civ.R. 26, governing the duty to supplement discovery, provides the following:
 (E) Supplementation of responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
 (1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify. [Emphasis added.]
The purpose of Civ.R. 26(E)(1)(b) is to prevent "trial by ambush."[5] For discovery to serve its purpose, a party must be given a reasonable opportunity to prepare a case against the opposing party.[6] The testimony of a party's expert is typically excluded for failure to disclose the subject matter of the expert's testimony where that subject matter is revealed for the first time at trial and the opposing party had no reason to anticipate it.[7]
In the case at bar, the opinion of the expert witness as to the cause of Reed's death changed dramatically from the time of discovery to the date of trial. During his trial testimony on April 30, 1999, Dr. Paul Hirsh, Dr Haq's expert witness, opined that the cause of Reed's death was that her heart "blew out" during the surgery that Dr. Esmaili performed. He testified at trial that "[Reed] died when she bled out from that hole in the heart." In contrast, Dr. Hirsh had testified during his deposition of March 19, 1998, that Reed's death was due to cardiac tamponade. His deposition testimony included the following:
 [E]verybody needs a certain volume of blood pumped per minute, circulating in the body to keep all of the organs functioning normally. And she had a reduced blood flow coming out of the heart because of the cardiac tamponade and the restriction in the heart to expand fully and take a full amount of blood for each stroke. And as a result, the organs of her body were deprived of sufficient blood to do their normal function.
Dr. Hirsch's deposition testimony as to the cause of death was therefore consistent with that of Fetters's expert, Dr. O'Grady: specifically, that the decreased blood flow resulted in a pH that had become too low for Reed's survival. This was a crucial point in the case against Dr. Haq, because the acidotic condition was arguably attributable to Dr. Haq's delay in taking Reed to surgery. The "blow-out" theory, by contrast, served to shift the fault for Reed's death to Dr. Esmaili, who had already been dismissed from the proceedings.
The fact that Dr. Hirsh's opinion had changed was made explicit at trial. When Dr. Hirsch was cross-examined by Fetters's counsel, he conceded that his opinion had changed:
 That's true that that's what I said at that time. But since, originally when I prepared for this, my focus was different. My focus was on what had happened in the cath lab and what Dr. Haq had done, and those kinds of issues. And when — the times of the operating room. And as a result, actually of you asking me these questions, I went back and looked more and spoke with the [defense attorneys] about what actually took place, read Dr. Esmaili's deposition, and focused on these issues. And actually then talked with him more about Dr. Esmaili's testimony in this trial, to understand what happened. And now I understand more that blow out occurred in the operating room. So, I guess, there has been some change in the sense that there was tamponade and that was in a sense a cause, because if it hadn't been there they wouldn't have gone to the operating room. But the death specifically, the final event, was the bleeding when they operated and opened up that tamponade.
Fetters moved that Dr. Hirsh's opinion as to the cause of death be stricken, and when that motion was denied, she moved for a mistrial. The basis of Fetters's motion was that Dr. Hirsh had changed his opinion without giving notice as required by Civ.R. 26, and that the discussions between defense counsel and Dr. Hirsh had violated the court's separation-of-witnesses order.
We agree that Fetters was deprived of a fair trial as a result of the failure of notice pursuant to Civ.R. 26. While the exclusion of evidence and other sanctions for violation of the civil rules are matters committed to the sound discretion of the trial court,[8] we hold that the lower court's decision to allow Dr. Hirsh's new opinion to stand was unreasonable under the circumstances. Our conclusion is reinforced by a ruling made during the testimony of Fetters's expert, Dr. O'Grady, when the court sustained defense objections to statements that Dr. Haq had deviated from the standard of care by retracting the pacemaker leads and by failing to elevate Mrs. Reed during pericardiocentesis. The basis of the court's decision in this respect was that Dr. O'Grady had not expressed those opinions during his discovery deposition. The court's failure to follow the same reasoning with respect to Dr. Hirsh's opinion resulted in a manifest injustice, given the crucial nature of the contested testimony.
Because we hold that the lower court erred by not granting relief due to the discovery violation, we need not address the issue of whether the discussion between Dr. Hirsh and counsel violated the court's separation order. The first assignment of error is sustained.
In her second assignment of error, Fetters maintains that the lower court erred by granting the motion for a directed verdict in favor of St. Francis/St. George. This assignment is also well taken.
In its entry granting the motion, the lower court reasoned that Reed was on notice that the physicians at St. Francis/St. George were not its employees, because she had signed consent forms containing language to that effect. The court further cited hospital records reflecting that Reed's personal physicians had referred her to Dr. Haq. Under those circumstances, the trial court concluded, St. Francis/St. George could not be held vicariously liable.
Pursuant to Civ.R. 50, the trial court must grant a motion for a directed verdict, when, construing the evidence most strongly in favor of the nonmoving party, it concludes that reasonable minds can come to but one conclusion, which is adverse to the nonmoving party.[9] The Supreme Court of Ohio has held that "[a] hospital may be liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital when (1) it holds itself out to the public as a provider of medical services; and (2) in the absence of notice and knowledge to the contrary, the patient looks to the hospital as opposed to the individual practitioner to provide competent medical care."[10]
St. Francis/St George first contends that it did not hold itself out as a provider of medical services, because the treating physicians were not its employees, and, under the law, a hospital can only provide medical services through its own employees. The court in Cox v. Ohio St. Univ. Hosp[11]
refused to accept a hospital's attempt to disavow any role in holding itself out as a medical provider, and we do the same here. The issue then becomes whether Reed looked to the hospital rather than the attending physicians to provide competent medical care.[12]
Our review of the record convinces us that reasonable minds could come to different conclusions on this issue. Fetters produced evidence that Reed and her family selected St. Francis/St. George because it was in proximity to their residence. This evidence itself permitted the inference that Reed initially looked to the hospital rather than its physicians to provide competent care.
In arguing that vicarious liability cannot attach, St. Francis/St. George relies first upon the fact that its records reflect that Reed's personal physicians had selected Dr. Haq to treat her. However, there is evidence in the record that Reed did not call her personal physician prior to going to the St. Francis/St. George emergency room and that, instead, it was hospital personnel who had telephoned Dr. Martinez. The evidence otherwise demonstrated that, in the past, Reed had contacted Dr. Martinez prior to going to a hospital. Evidence that she did not do so in this instance again permitted the inference that Reed relied upon the hospital to provide the necessary medical care, thereby rendering the directed verdict erroneous.
St. Francis/St. George also emphasizes that Reed signed hospital consent forms acknowledging that Dr. Haq was not an employee of the hospital. However, as this court has stated in prior cases, merely having a patient sign acknowledgement forms while awaiting treatment for a serious malady does not necessarily constitute meaningful notice.[13] In this case, Fetters produced evidence that Reed did not comprehend the import of the consent forms as they related to the treatment provided by Dr. Haq. Moreover, Reed was not even conscious when she was taken to the operating room, and the consent forms concerning Dr. Esmaili's treatment were executed by Reed's grandson. Accordingly, we hold that the lower court erred by directing a verdict in favor of St. Francis/St. George, because reasonable minds could differ concerning whether Reed had received adequate notice that the physicians were not employees of the hospital. The second assignment of error is therefore sustained.
In her third assignment of error, Fetters maintains that the lower court erred by not excluding testimony relating to settlement of the claims against Dr. Esmaili and by refusing to grant a mistrial when St. Francis/St George elicited that testimony. We find no error in the trial court's decision.
Although Evid.R. 408 provides that evidence of compromise or offers to compromise is not "admissible to prove liability for or invalidity of the claim or its amount," there was no violation of that rule in the instant case. Here, the contested questions were not directed toward the liability of Dr. Esmaili or the validity of the claims against the remaining defendants but were posed in response to the testimony of a plaintiff's witness concerning the amount of money she had received from Reed's estate. Fetters's first amended complaint contained a claim for damages due to the loss of prospective inheritance. During cross-examination, counsel for St. Francis asked one of Reed's daughters, Betty Harvey, questions regarding the sums that she received from her mother's estate. Harvey responded that she had received $3,900. Counsel then asked if she had received $21,000, and Harvey responded that she had received that sum that day. Thus, the question elicited proper impeachment testimony relating to the loss-of-inheritance claim and did not violate Evid.R. 408. The third assignment of error is overruled.
In her fourth and final assignment of error, Fetters argues that the trial court erred in refusing to instruct the jury to answer an interrogatory. We are not persuaded. During its charge to the jury, the lower court gave instructions concerning the verdict forms and the eleven interrogatories that the jury was to consider during its deliberations. Interrogatory A provided, "Do you find that [Dr. Haq] was negligent with respect to his care and treatment of Sudie Reed?" The court instructed the jury to circle "yes" or "no" and to proceed to the general verdict form in favor of Dr. Haq if the answer were "no."
After the jury concluded its deliberations, it returned a general verdict in favor of Dr. Haq without having answered interrogatory A. Prior to the jury being discharged, counsel for Fetters alerted the court to the fact that the jury had not answered interrogatory A. Counsel requested that the court return the jury to the jury room to reconcile its verdict with the interrogatory. However, after further discussions between counsel and the court, counsel withdrew that request and merely asked the court to note his objection. Under these circumstances, we hold that Fetters waived her claim of error with respect to the interrogatory. Moreover, any error is rendered moot by our reversal of the judgment on the separate grounds enumerated above. Accordingly, the fourth assignment of error is overruled. The judgment of the court of common pleas is reversed, and the cause is remanded for a new trial consistent with this opinion and law.
Judgment reversed and cause remanded.
 SUNDERMANN and WINKLER, JJ., concur.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Opinion.
[1] Fetters commenced the instant action in her individual capacity and as administrator of the estate of the decedent, Sudie Reed.
[2] In 1993 and 1994, Dr. Esmaili had trained Dr. Haq to implant pacemakers. Though Dr. Esmaili was named as a defendant in Fetters's complaint, the claims against him were settled prior to trial.
[3] This is a procedure to drain fluid from the pericardial sac with a needle.
[4] Though the judgments in favor of Dr. Haq and St. Francis/St. George were journalized in separate entries, we refer to them as a single judgment.
[5] Walker v. Holland (1997), 117 Ohio App.3d 775,785, 691 N.E.2d 719, 725.
[6] Id.
[7] See id. at 788; Waste Mgt. of Ohio, Inc. v.Mid-America Tire, Inc. (1996), 113 Ohio App.3d 529, 534,681 N.E.2d 492, 495.
[8] Pang v. Minch (1990), 53 Ohio St.3d 186,559 N.E.2d 1313.
[9] Alley v. Wendy's International, Inc. (1995),107 Ohio App.3d 810, 814, 669 N.E.2d 538, 540.
[10] Clark v. Southview Hosp. and Family Health Ctr.
(1994), 68 Ohio St.3d 435, 628 N.E.2d 46, syllabus.
[11] (1996), 117 Ohio App.3d 254, 690 N.E.2d 552.
[12] Fetters argues that evidence concerning Reed's expectations of the quality of treatment was improperly excluded. However, we find no abuse of discretion in the trial court's rulings. Evidence of Reed's expectations as to the quality of treatment was irrelevant to the issue of whether she looked to the hospital to provide her treatment or merely to provide the facility where her physician would treat her. See Wise v.Qualified Emergency Specialists, Inc. (Dec. 17, 1999), Hamilton App. No. C-980802, unreported, citing Clark,supra, at 445, 628 N.E.2d at 53.
[13] Wise, supra, citing Clark, supra, at 445-446, 628 N.E.2d at 54.