[Cite as *Badra-Muniz v. Vinyl Carpet Serv. Inc.*, 2024-Ohio-5507.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| PEDRO BADRA-MUNIZ | : | |
| | : | |
| Appellant | : | C.A. No. 29942 |
| | : | |
| v. | : | Trial Court Case No. 2021 CV 01031 |
| | : | |
| VINYL CARPET SERVICE INC. et al. | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 22, 2024

. . . . . . . . . . .

THOMAS J. INTILI, Attorney for Appellant

T. ANDREW VOLLMAR, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Plaintiff-Appellant Pedro Badra-Muniz appeals from a judgment of the Montgomery County Common Pleas Court granting summary judgment to Defendant-

Appellee Vinyl Carpet Service Inc. ("Vinyl & Carpet") on his negligence claims. For the reasons that follow, we will affirm the judgment of the trial court.

I.    Course of Proceedings

{¶ 2} On May 1, 2019, Badra-Muniz was an employee of a general contractor, Healthcare Dekor, LLC, and was responsible for supervising a remodeling project at Gem City Nursing and Rehabilitation Center in Dayton, Ohio. Vinyl & Carpet was a subcontractor on the remodeling project. Thomas Dixon, an agent of Vinyl & Carpet, applied a glue and cleaning solution to the floor he was installing and left the area for a period of time. Shortly after the application of the glue and cleaning solution, Badra-Muniz entered the room and slipped and fell. He sustained severe injuries to his left knee. As a result, Badra-Muniz has had two surgeries and undergone extensive physical therapy.

{¶ 3} On March 15, 2021, Badra-Muniz filed a complaint in the Montgomery County Common Pleas Court against Vinyl & Carpet and "JOHN DOES (1-99)." According to paragraph ten of the complaint, "John Doe No. 1, a Vinyl & Carpet Service employee or agent, spilled an oily substance on the floor, then left the area for extended period of time without cleaning up the spill or erecting a sign warning of the hazard."

{¶ 4} On April 1, 2022, Badra-Muniz filed a notice of deposition of Dixon, which was scheduled to take place later that month. On April 11, 2022, Vinyl & Carpet filed a motion for summary judgment on Badra-Muniz's complaint. On May 6, 2022, Badra-Muniz filed another notice of deposition of Dixon, and the deposition took place on May

24, 2022.  Badra-Muniz never served Dixon with a copy of the original complaint.

{¶ 5} On June 3, 2022, Badra-Muniz filed his first amended complaint, in which he identified Dixon as the agent of Vinyl & Carpet who had spilled the slippery substance that caused Badra-Muniz to fall and incur significant injuries.   A copy of the first amended complaint was served on Dixon via Federal Express on July 5, 2022.

{¶ 6} On July 19, 2022, Dixon filed a motion to dismiss Badra-Muniz's action against him because Badra-Muniz had failed to properly serve him "as required by Civ.R. 15(D)" and "the Amended Complaint is time barred by the applicable statute of limitations."   While Vinyl & Carpet's motion for summary judgment and Dixon's motion to dismiss were pending, Badra-Muniz filed a motion for leave of court to file a second amended complaint.

{¶ 7} On September 14, 2022, the trial court issued a decision sustaining Dixon's motion to dismiss and overruling Badra-Muniz's motion for leave to file a second amended complaint.   The trial court found that it was "apparent on the face of the record that Badra-Muniz failed to comply with Ohio Rules of Civil Procedure 15(D) and 3(A)."   The court rejected Badra-Muniz's argument that the time to amend his complaint in conformance with Civ.R. 15(D) and 3(A) had been tolled by R.C. 2305.15.   As a result, the trial court found that the claims raised against Dixon in Badra-Muniz's first amended complaint were barred by the statute of limitations.   The trial court's decision cited Civ.R. 54, and it stated that it was a final appealable order and there was no just cause for delay.   No party filed a timely notice of appeal from the September 14, 2022 decision.

{¶ 8} In April 2023, Vinyl & Carpet filed a supplemental memorandum in support

of its motion for summary judgment, adding the argument that the trial court's September 14, 2022 decision required the grant of summary judgment in Vinyl & Carpet's favor. On September 13, 2023, the trial court granted Vinyl & Carpet's motion for summary judgment on Badra-Muniz's first amended complaint. The trial court found that there could be no liability assigned to Vinyl & Carpet as Dixon's employer, because the claims against Dixon were time-barred. According to the trial court, if the claims against an employee are time-barred, the Ohio Supreme Court's decision in *Clawson v. Hts. Chiropractic Physicians, L.L.C.*, 2022-Ohio-4154, precludes any vicarious liability being imposed on the employer. Further, the trial court found that Vinyl & Carpet could not be found liable for negligence based on premises liability because (1) Vinyl & Carpet, as a subcontractor, did not have possession and control of the premises where the injury occurred; (2) Badra-Muniz's work was inherently dangerous; and (3) "Vinyl & Carpet did not actively participate in [Badra-Muniz's] work or exercise exclusive control over a critical variable at the worksite." Decision (Sept. 13, 2023), p. 14-21. Badra-Muniz filed a timely notice of appeal from the trial court's September 13, 2023 decision.

II.     The First Assignment of Error Is Overruled Based on Our February 6, 2024 Order

{¶ 9} The first assignment of error states:

THE TRIAL COURT ERRED WHEN IT OVERRULED PLAINTIFF-APPELLANT'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT, THEN DISMISSED THOMAS DIXON AS A PARTY

DEFENDANT WITH PREJUDICE.

{¶ 10} This assignment of error concerns the trial court's September 14, 2022 decision. On January 16, 2024, Vinyl & Carpet moved to partially dismiss the appeal and to strike a portion of Badra-Muniz's brief. According to Vinyl & Carpet, Badra-Muniz failed to file a timely notice of appeal from the September 14, 2022 decision. On February 6, 2024, we issued an order sustaining Vinyl & Carpet's motion to partially dismiss the appeal and to strike a portion of Badra-Muniz's brief as far as Badra-Muniz sought to belatedly appeal the trial court's September 14, 2022 decision. Badra-Muniz file an application for reconsideration of our February 6, 2024 order, which we denied. Pursuant to our February 6, 2024 order, the first assignment of error is overruled.

III. The Trial Court Properly Applied Ohio Supreme Court Precedent in Granting Vinyl & Carpet's Motion for Summary Judgment

{¶ 11} The second assignment of error states:

THE TRIAL COURT ERRED BY ENTERING SUMMARY JUDGMENT FOR DEFENDANT-APPELLEE VINYL & CARPET SERVICE, INC. ON PLAINTIFF-APPELLANT'S CLAIM FOR VICARIOUS LIABILITY.

{¶ 12} Appellate review of a trial court's ruling on a party's motion for summary judgment is de novo. *Rhododendron Holdings, LLC v. Harris*, 2021-Ohio-147, ¶ 22 (2d Dist.), citing *Schroeder v. Henness*, 2013-Ohio-2767, ¶ 42 (2d Dist.). De novo review requires an appellate court to apply the same standard that the trial court should have used without deference to the trial court's findings. *Riverside v. State*, 2016-Ohio-2881,

¶ 21 (2d Dist.).

{¶ 13} Civ.R. 56(C) provides for summary judgment where: "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law." *Byrd v. Smith*, 2006-Ohio-3455, ¶ 10, citing Civ.R. 56(C) and *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

{¶ 14} "The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated." *McAlpine v. McCloud*, 2021-Ohio-2430, ¶ 11 (2d Dist.), citing *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115 (1988). "Once the moving party has satisfied its burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the nonmoving party bears a reciprocal burden to set forth specific facts showing a genuine issue for trial." *Shaeffer v. FC Industries Inc.*, 2023-Ohio-3732, ¶ 15 (2d Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). "However, when a motion for summary judgment is made and supported as provided in Civ.R. 56, the nonmoving party may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing the existence of a genuine triable issue." (Citations omitted.) *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 385 (1996). "If no

genuine issue of material fact exists, summary judgment must be awarded as a matter of law." *Dayton v. Parson*, 2023-Ohio-1509, ¶ 6 (2d Dist.).

**{¶ 15}** Badra-Muniz's first amended complaint raised negligence claims against Vinyl & Carpet based on the actions of its agent, Dixon. " 'It is a fundamental maxim of law that a person cannot be held liable, other than derivatively, for another's negligence.' " *Comer v. Risko*, 2005-Ohio-4559, ¶ 17, quoting *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 254-255 (1990), *overruled on other grounds by Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 444-445 (1994). "In the employment-law context, 'the most common form of derivative or vicarious liability is that imposed by the law of agency, through the doctrine of respondeat superior.' " *Clawson*, 2022-Ohio-4154, at ¶ 11, quoting *Albain* at 255.

**{¶ 16}** The Ohio Supreme Court has "long recognized that an employer is vicariously liable for the negligence of its employees under the doctrine of respondeat superior." *Id.* at ¶ 12, citing *Clark* at 438, citing *Councell v. Douglas*, 163 Ohio St. 292, 295-296 (1955). "More than 80 years ago, [the Ohio Supreme Court] explained that an employer may be liable for a wrong committed by its employee when the employer delegates a course of action to the employee and the employee then commits a tortious act while acting within the scope of his employment as to the delegated course of action." *Id.*, citing *Losito v. Kruse*, 136 Ohio St. 183, 186 (1940). "The employer and the employee are not jointly liable under that circumstance; the 'primary liability' rests with the employee who committed the wrong, and the 'secondary liability' rests with the employer by reason of its relationship with the employee-wrongdoer." *Id.*, citing *Losito* at 187.

{¶ 17} Given this backdrop, the trial court began its analysis of Badra-Muniz's negligence claims by stating that "longstanding Ohio vicarious-liability law has permitted a plaintiff who was injured by an employee acting within the scope of their employment to seek damages against either the employee, the employer, or both." Decision (Sept. 13, 2023), p. 6, citing *Losito* at 187 and *Maple v. Cincinnati Hamilton & Dayton RR. Co.*, 40 Ohio St. 313, 316 (1883). As the trial court explained, "the traditional rule in Ohio has not required a plaintiff to actually obtain a judgment against the employee, or to even file suit against them, in order to prevail on a vicarious liability claim against the employer." *Id.* at 7. "However, starting in 2005, several holdings from the Ohio Supreme Court . . . appeared to stray from this longstanding rule and blur the distinction between establishing the negligence of an employee and actually obtaining, or being able to obtain, a judgment against the employee." *Id.*

{¶ 18} The trial court then discussed several Ohio Supreme Court decisions since 2005, including *Clawson*, 2022-Ohio-4154, and *Natl. Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 2009-Ohio-3601. Based on its review of these Ohio Supreme Court decisions, the trial court concluded that:

> The facts and circumstances in the case before this Court are very similar to those in *Clawson*. Plaintiff timely filed his initial claims against Vinyl & Carpet and "John Doe" employee. However, like Clawson, due to a procedural defect Plaintiff did not timely "commence" his action against Vinyl & Carpet's employee, Mr. Dixon. As a result, this Court dismissed Plaintiff's claims against Mr. Dixon as being time-barred. . . .

Thus, like *Clawson*, there can be no liability assigned to the employee in this case, as the claims against Mr. Dixon are time barred. Therefore, as the principal and Mr. Dixon's employer, no vicarious liability can be imposed upon Vinyl & Carpet pursuant to *Clawson*.

Decision (Sept. 13, 2023), p. 13-14. The trial court granted summary judgment to Vinyl & Carpet on Badra-Muniz's negligence claims.

**{¶ 19}** Badra-Muniz contends that the trial court misapplied the holdings in *Clawson* and *Wuerth*. According to Badra-Muniz, the trial court instead should have applied the following well-established rule from *Losito*: "[w]here a liability arises against both a master and his servant in favor of a party injured by the sole negligence of the latter while acting for the master, such injured party may sue either the servant, primarily liable, or the master, secondarily liable, or both, in separate actions[.]" *Losito* at paragraph two of the syllabus. Badra-Muniz contends the holdings from *Clawson* and *Wuerth* that veered from the well-established rule in *Losito* should only be applied in the narrow context of professional malpractice actions. In support of his argument, Badra-Muniz notes that the Ohio Supreme Court has never explicitly overruled *Losito*.

**{¶ 20}** Vinyl & Carpet responds that the Ohio Supreme Court's holdings in *Wuerth* and *Clawson* mandated the trial court's grant of summary judgment. Vinyl & Carpet cites recent decisions by the Eighth and Tenth District Courts of Appeals that have upheld judgments in favor of employers when the plaintiff's claims against the employer's agent failed. Appellee's Brief, p. 11-12, citing *Miller v. NWD 355 McConnell LLC*, 2023-Ohio-3374 (10th Dist.), and *Lewicki v. Grange Ins. Co.*, 2023-Ohio-4544 (8th Dist.). Vinyl &

Carpet also cites *Stolz v. J & B Steel Erectors, Inc.*, 2016-Ohio-1567, for the proposition that the Ohio Supreme Court has applied its holding from *Wuerth* to cases outside the context of professional malpractice actions.

{¶ 21} We agree with the trial court and Vinyl & Carpet that recent Ohio Supreme Court precedent required the trial court to grant summary judgment in Vinyl & Carpet's favor. This is best illustrated by starting with the Ohio Supreme Court's decision in *Losito* and working our way forward.

{¶ 22} In *Losito,* 136 Ohio St. 183, the Ohio Supreme Court made several points that have helped shape the doctrine of respondeat superior. First, the Court held that "[w]hen, under the doctrine of respondeat superior, a master becomes liable in damages for personal injuries caused solely by the negligent act of his servant, the latter is primarily liable and the former secondarily liable to the injured party[.]" *Id.* at paragraph one of the syllabus. Further, "if the master is obliged to respond in damages by reason of such liability, he will be subrogated to the right of the injured party and may recover his loss from the servant, the one primarily liable." *Id.* The Court also pointed out that "[a] settlement with and release of the servant will exonerate the master. Otherwise, the master would be deprived of his right of reimbursement from the servant, if the claim after settlement with the servant could be enforced against the master." (Citations omitted.) *Id.* at 188.

{¶ 23} In *Comer*, 2005-Ohio-4559, a plaintiff filed a complaint alleging that several physicians had committed medical negligence by failing to timely diagnose and treat cancer. The plaintiff sued a hospital based on a theory of agency by estoppel. "The

doctors, independent contractors who provided their services pursuant to a contract with the hospital, were not named as parties to this action. The statute of limitations expired, and their liability, if any, was extinguished." *Id.* at ¶ 9. The Court noted that in such situations of vicarious liability, "[a]n agent who committed the tort is primarily liable for its actions, while the principal is merely secondarily liable." *Id.* at ¶ 20, citing *Losito* and *Herron v. Youngstown*, 136 Ohio St. 190 (1940). Further, "[t]he liability for the tortious conduct flows through the agent by virtue of the agency relationship to the principal. If there is no liability assigned to the agent, it logically follows that there can be no liability imposed upon the principal for the agent's actions." *Id.*, citing *Losito* and *Herron*.

{¶ 24} The *Comer* Court explained that, "[i]n situations involving vicarious liability, there arises the right of indemnity in the party that is secondarily liable. . . . It logically follows that release of the employee from liability would thwart the employer's ability to seek reimbursement from the employee for payments made to the plaintiff by destroying the employer's subrogation rights." *Id.* at ¶ 24, citing *Wells v. Spirit Fabricating, Ltd.*, 113 Ohio App.3d 282, 293 (8th Dist. 1996). "Consequently, a direct claim against a hospital premised solely upon the negligence of an agent who cannot be found liable is contrary to basic agency law." *Id.* at ¶ 25. As a result of the expiration of the statute of limitations on the plaintiff's claim against the agent, the Court concluded that "[i]n the absence of the tortfeasor's primary liability, there is no liability that may flow through to the hospital on an agency theory." *Id.* at ¶ 29.

{¶ 25} In *Wuerth*, 2009-Ohio-3601, the Ohio Supreme Court again addressed this distinction between primary and secondary liability based on a vicarious liability theory.

There, an insurance company sued its attorney for legal malpractice and alleged the attorney's law firm was vicariously liable for its employee's legal malpractice. The plaintiff insurance company, however, had filed its complaint after the expiration of the one-year statute of limitations for legal malpractice claims. *Id.* at ¶ 7-8.

{¶ 26} The Ohio Supreme Court began its analysis by reiterating that "[a]lthough a party injured by an agent may sue the principal, the agent, or both, a principal is vicariously liable only when an agent could be held directly liable." *Id.* at ¶ 22. It explained that this principle was consistent with its holdings in *Losito* and *Comer*. The Court stated that "*this rule applies not only to claims of respondeat superior, but also to other types of vicarious liability. . . . There is no basis for differentiating between a law firm and any other principal to whom Ohio law would apply*." (Emphasis added.) *Id.* at ¶ 23-24. Based on this principle, the Court held "that a law firm may be vicariously liable for legal malpractice only when one or more of its principals or associates are liable for legal malpractice." *Id.* at ¶ 26.

{¶ 27} The Ohio Supreme Court then muddied the waters somewhat in *State ex rel. Sawicki v. Lucas Cty. Court of Common Pleas*, 2010-Ohio-3299. There, a plaintiff patient sued his primary-care physician for medical negligence and that physician's private employer under the theory of respondeat superior. At the time of treatment, the physician was both an employee of a state medical college hospital and an employee of a private employer. The trial court dismissed the claims against the physician, finding that because the doctor was a state employee during the alleged malpractice, the Court of Claims had exclusive jurisdiction to determine whether he was acting within the scope

of his employment with the state at the time, which would make him immune from liability. Plaintiff conceded that he had not filed in the Court of Claims and that such an action was time-barred.

{¶ 28} The Ohio Supreme Court concluded that the plaintiff could proceed on his claim against the physician's private employer in spite of the fact that the physician was immune from liability. According to the Court, "[a]n employee's immunity from liability is no shield to the employer's liability for acts under the doctrine of respondeat superior. . . . A private employer may still be liable even if the employee is personally immune, for the doctrine of respondeat superior operates by imputing to the employer the acts of the tortfeasor, not the tortfeasor's liability." *Id.* at ¶ 28. The Court distinguished its holding in *Comer* based on the fact that it had turned on a theory of agency by estoppel and the claim in that case had been extinguished by the statute of limitations, not by the application of immunity. As the Court explained, " 'a determination of immunity is not a determination of liability.' " *Id.* at ¶ 29, quoting *Johns v. Univ. of Cincinnati Med. Assocs., Inc.*, 2004-Ohio-824, ¶ 37.

{¶ 29} Finally, the Ohio Supreme Court issued its decision in *Clawson*, 2022-Ohio-4154. There, a plaintiff sued her chiropractor and the chiropractor's employer for medical malpractice. The plaintiff voluntarily dismissed her initial claims but refiled her claims within the time allowed by Ohio's savings statute, R.C. 2305.19(A). *Id.* at ¶ 2. The chiropractor filed a motion to dismiss the refiled complaint based on plaintiff's failure to perfect service on him within one year of the refiling of her complaint. He also argued that the one-year statute of limitations applicable to the claims had expired, thus

precluding the plaintiff from filing a valid new complaint against him. *Id.* at ¶ 6. Ultimately, the trial court dismissed the plaintiff's claims against both the chiropractor and his employer, determining that the employer's vicarious liability was contingent on the chiropractor's direct liability and that, because the primary claims against the chiropractor were extinguished, so too was the secondary claim against the chiropractor's employer. *Id.* at ¶ 8. On appeal, we held that the plaintiff could pursue her claim against the chiropractor's employer for the negligence of the chiropractor even though the trial court had properly dismissed her direct claim against the chiropractor. *Id.* at ¶ 9, citing *Clawson v. Hts. Chiropractic Physicians, LLC*, 2020-Ohio-5351 (2d Dist.). The chiropractor's employer filed a discretionary appeal, which the Ohio Supreme Court accepted.

{¶ 30} The Ohio Supreme Court began its analysis in *Clawson* by tracing since *Losito* its long recognition that an employer is vicariously liable for the negligence of its employees under the doctrine of respondeat superior. *Id.* at ¶ 12. While discussing its decision in *Comer*, the Court noted that, "[a]lthough Comer involved an agency-by-estoppel claim, we did not distinguish between vicarious liability based on the doctrine of respondeat superior and vicarious liability based on the theory of agency by estoppel." *Id.* at ¶ 16. The Court also noted that its *Wuerth* decision has resulted in conflicting interpretations by Ohio's appellate courts. The Court explained that it had relied in *Wuerth* on basic principles of agency law that equally applied to the facts before it in *Clawson*. Therefore, the Ohio Supreme Court concluded:

> In *Wuerth*, we applied basic principles of agency law and held, "A law

firm may be vicariously liable for legal malpractice only when one or more of its principals or associates are liable for legal malpractice." . . . Not only did we emphasize the similarities between the legal and medical professions with respect to liability for malpractice, but we also stated, "There is no basis for differentiating between a law firm and any other principal to whom Ohio law would apply." . . . Today, we hold that the rule stated in *Wuerth* applies equally to claims of vicarious liability for medical malpractice.

Because Clawson had failed to timely serve Dr. Bisesi with her refiled complaint and because the statute of limitations on her claim against Dr. Bisesi had expired, Clawson's right of action against Dr. Bisesi was extinguished by operation of law. As a result, Heights Chiropractic, as Dr. Bisesi's employer, may not be held vicariously liable for Dr. Bisesi's alleged malpractice.

*Id.* at ¶ 32-33.

**{¶ 31}** The Ohio Supreme Court's recent guidance regarding vicarious liability in the principal-agent context is clear. Once liability has been extinguished against an agent due to the expiration of the statute of limitations, as in the case before us, the trial court is required to dismiss the derivative claim against the principal if the principal raises and establishes this defense. As the Ohio Supreme Court has emphasized twice, this principle applies to any principal to whom Ohio law would apply. *Id.* at ¶ 32; *Wuerth*, 2009-Ohio-3602, at ¶ 24. While we understand Badra-Muniz's attempt to limit the Ohio

Supreme Court's holdings in *Wuerth* and *Clawson* to only cases involving professional negligence, the language contained in the Ohio Supreme Court's recent decisions is not so limited. Therefore, we cannot conclude that the trial court erred in granting Vinyl & Carpet's motion for summary judgment.

{¶ 32} The second assignment of error is overruled.

IV. The Trial Court Properly Granted Summary Judgment on The Negligence Claims as Far as They Relied on Premises Liability

{¶ 33} The third assignment of error states:

THE TRIAL COURT ERRED BY ENTERING SUMMARY JUDGMENT FOR DEFENDANT-APPELLEE VINYL & CARPET SERVICE, INC. ON PLAINTIFF-APPELLANT'S NEGLIGENCE CLAIMS.

{¶ 34} The trial court stated that, "[i]n the negligence context, an employer can generally only be held vicariously liable for the acts of its employees." Decision (Sept. 13, 2023), p. 14. The trial court reasoned, however, that an employer may still be liable for acts of an employee outside the context of respondeat superior if the negligence claims are based on premises liability. Despite this, the trial court concluded that Vinyl & Carpet could not be found liable under the theory of premises liability because there was no genuine issue of material fact that: (1) Vinyl & Carpet did not have possession and control of the premises where the injury occurred; (2) Badra-Muniz's work was inherently dangerous; and (3) "Vinyl & Carpet did not actively participate in [Badra-Muniz's] work or exercise exclusive control over a critical variable at the worksite." *Id.* at

14-21.

**{¶ 35}** Badra-Muniz contends that Vinyl & Carpet is liable to him under Ohio's frequenter statutes. He argues that Dixon and Vinyl & Carpet controlled the premises where he slipped and was injured, and he was not engaged in inherently dangerous conduct at the time he fell. Therefore, Badra-Muniz believes his negligence claim based on premises liability should have survived summary judgment.

**{¶ 36}** Vinyl & Carpet responds that it owed no duty to warn employees of the general contractor, because Vinyl & Carpet did not own or control the premises. Vinyl & Carpet also contends that it was not required to warn Badra-Muniz of its inherently dangerous work, because inherently dangerous work serves as its own warning.

A.     Deposition Testimony

**{¶ 37}** In order to resolve this assignment of error, it is necessary for us to review the deposition testimony of Badra-Muniz and Thomas Dixon. Badra-Muniz was deposed on January 12, 2022, and testified as follows. In May 2019, he was injured while employed by Healthcare Dekor, a company for which he had worked since May 2018. Prior to working for Healthcare Dekor, he worked for about three years with businesses in the same industry doing painting and wall covering.

**{¶ 38}** Badra-Muniz began working on the job at Gem City in February 2019 and was the only Heathcare Dekor employee on site. He was the Assistant Manager for the Gem City Nursing Home job and described his role as follows:

I was the eyes of the general contractor, so in his absence making

sure work keeps on track. And I also did general labor for them, demolition. I would take care of the material stock. Like piles of floor would come, and I would have to come with a pallet jack, bring it to the -- stock it efficiently so it doesn't look like a mess.

And I keep track of whatever a worker from the subcontractors need, the material they would inquire me, well, we need certain planks for this and that. So that's how it goes.

Badra-Muniz Depo., p. 16-17. Badra-Muniz also put up zip walls to make sure that patients did not walk into the worksite. A zip wall is made of plastic that one can tighten so that the zip may only be opened from inside the plastic, which prevents people from entering an area they are not supposed to enter.

{¶ 39} Elliott Alvayor and Jon Berl were the owners of Healthcare Dekor. Berl ordered the material for the subcontractors, and Alvayor scheduled the work of the subcontractors. Alvayor would come on a regular basis to observe the work.

{¶ 40} Prior to his injury, Badra-Muniz did not have any problems with the subcontractors on the Gem City job. Jim Miller did the painting on the job, and the carpentry work was done by Mr. Elbaz, who also had other people working for him. The painter started first on the job, the flooring crew started about two weeks after the painter, and the plumber started working on any areas that the flooring crew had completed.

{¶ 41} Vinyl & Carpet was in charge of completing the flooring and sent crews of 2-6 people each day to do the work. Thomas Dixon was the only Vinyl & Carpet worker whose name Badra-Muniz could remember. The flooring consisted of vinyl planks,

which looked like fake wood. Glue was used to keep the planks in place. Alvayor ordered the glue for the subcontractors. Badra-Muniz would transport the vinyl planks with a pallet jack and take them to the storage room. When the subcontractor needed the planks, it would call Badra-Muniz and tell him how many were needed and what color. He would then open the storage room for the subcontractor. The subcontractor went through the same process when it needed glue.

{¶ 42} Badra-Muniz had prior experience assisting in laying this type of vinyl flooring. After marking off the area for the flooring and preparing the room for installation, the flooring installers put glue on the area where the planks were to be laid. They waited 20-30 minutes after putting the glue down, then the installers started setting planks in the glue one at a time. When the glue was first applied, it was either slippery or sticky, depending on the type of glue. Badra-Muniz characterized the type of glue used at the Gem City job as midway between sticky and slippery. He observed the Vinyl & Carpet installers complete the first hallway.

{¶ 43} Badra-Muniz was injured on the second floor of the building while Dixon was finishing the first hallway by doing the "punch up," a term that described the time spent fixing a few little things after the flooring had been laid down. Badra-Muniz described Dixon as experienced. Dixon did not lay the floors by himself, but he was in charge of doing the punch work. At the time he was injured, Badra-Muniz was supervising work. He was aware that Dixon was doing punch up work and went to check on him. When he walked into the room, Dixon was not in there, and Badra-Muniz slipped and fell due to some excess glue that Dixon left there after he had cut planks to

make them fit properly as part of his punch up work. Badra-Muniz stated that Dixon was probably taking a smoking break when he was injured. He did not know when Dixon left to go on break and testified that, if he had seen him on break, Badra-Muniz would not have walked into the room.

{¶ 44} The glue was a light brown color, and the planks were gray. According to Badra-Muniz, the length of time it took the glue to dry to the point at which it was sticky and no longer slippery was anywhere between six hours to the next day. He saw the plank he slipped on before he slipped, but it looked clean and safe to walk on. He testified about what he believed caused his accident: "The thing is, [Dixon's] cleaning of the glue was unsuccessful. He did not clean it enough. He used the solvent to remove this glue. And it's solved a bit, but it just made the plank very slippery. And you couldn't see the glue anymore, and it looked -- it looked ready. I passed through, and I fell." Badra-Muniz Depo., p. 86. Badra-Muniz did not know what type of solvent Dixon had used because the subcontractor ordered its own solvent. He would not say that it was Dixon's fault that there was too much glue, but he believed it was Dixon's fault that the glue was not thoroughly cleaned.

{¶ 45} After he fell, Badra-Muniz began screaming, and Dixon came running in and tried to clean next to him. According to Badra-Muniz, as he was laying there in pain, Dixon "didn't even [come] to actually help me out, he came to finish cleaning what he failed to clean." *Id.* at 93. The plumber then helped Badra-Muniz across the street to a hospital. Badra-Muniz was on crutches for approximately two or three months after being treated for his injury. He was not aware that he could be covered by workers'

compensation until he was recovering in Chicago, Illinois. After his physical therapy was finished, he began receiving about $1,200 per week in workers' compensation benefits. He continues to have problems with his left knee.

**{¶ 46}** Thomas Dixon was deposed on May 24, 2022. He testified as follows about the Gem City Nursing Home job. The job entailed laying flooring on four or five floors with about 7,000 square feet per floor. There were five people on the floor on the day of Badra-Muniz's injury: one applying wallpaper, one plumber, two Vinyl & Carpet employees, and Badra-Muniz. According to Dixon, Badra-Muniz was supposed to be the superintendent of the project, but the other workers there "kind of led Pedro." Dixon Depo., p. 12. He did not believe Badra-Muniz had much construction experience or any expertise in flooring. Dixon did not receive any instruction from Badra-Muniz or the general contractor as to how to lay the flooring.

**{¶ 47}** Dixon received formal training for floor installation and additional on-the-job training. With each glue, he would read the instructions and determine which size trowel the manufacturer recommended. His work in the flooring business went back to the 1980s. He had also taken hundreds of hours of OSHA training.

**{¶ 48}** On the day of the injury, Dixon told Badra-Muniz that he was going to be doing the doorways, going door to door. This was part of the scope of work, not part of finishing a punch list. Dixon testified that he was only a few feet away when Badra-Muniz fell. Prior to the fall, Dixon had put glue with a trowel on the back of a vinyl piece and placed it on the floor. Badra-Muniz had watched Dixon put it in place. Dixon testified as follows as to what happened immediately before Badra-Muniz fell:

My tool bag was sitting behind me. I had put the piece in place. I had put a little mineral spirits -- now this is one doorway. That one doorway, I'm going to tell you, and you can -- it's like a third of a foot, on 7,000 feet in a building on the floor.

Pedro watched me put it in. Stood there. And what I did is I wiped it, put a little mineral spirits down, right? Had the torch there. Had the straight edge there. Had my light there. What I did is -- the cart was at the room I had just done, right? Now, mineral spirts evaporates anyway if you leave it there long enough.

. . .

The little extra glue that had seeped out in that little inch-and-a-half strip in that doorway, right? I was using mineral spirits so the glue didn't dry on top. I had used one rag and realized -- this is down -- I'm on my knees blocking the doorway from the hallway at this moment, right? And I thought I'm going to need a second rag. In the few moments that I walked from, like, this door to that bathroom door, grabbed a rag, I'm coming back, Pedro is standing in the doorway. He stepped over my tools. He's wearing gym shoes. Steps about two feet away and slips and falls. And I'm like, what are you doing?

Dixon Depo., p. 19-20. Dixon believed he left the room for no longer than 20 or 30 seconds, but it may have been as little as 7 seconds. He only had to go about 12-15 feet and back to grab a rag from the cart in the previous room. Dixon was only 3 feet

away when Badra-Muniz slipped and fell. According to Dixon, Badra-Muniz got up and walked away after he fell.

{¶ 49} When Dixon worked on the corridors, he would put up caution tape, signs, and cones. But when he did the rooms, he just placed his tool bag in the way. He did not think there was anything else he could have done to prevent Badra-Muniz's injury other than move his cart to block the entrance to the room. Dixon described the mineral spirits that Badra-Muniz slipped on as "half wiped up" and that it would have been completely wiped up once Dixon had returned with the rag from the next room. *Id.* at 26. After Badra-Muniz got up and walked away, Dixon wiped up the rest of the mineral spirits.

### B. Frequenter Statutes

{¶ 50} R.C. 4101.11 and 4101.12 are commonly referred to as the "frequenter statutes." R.C. 4101.11 provides:

> Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.

{¶ 51} R.C. 4101.12 provides:

No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

{¶ 52} "Originally enacted to benefit employees, these statutes are 'no more than a codification of the common-law duty owed by the owner or occupier of premises to business invitees to keep his premises in a reasonably safe condition and to give warnings of latent or concealed perils of which he has, or should have, knowledge.' " *Kucharski v. Natl. Eng. & Contracting Co.*, 69 Ohio St.3d 430, 432-433 (1994), quoting *Westwood v. Thrifty Boy Super Markets, Inc.*, 29 Ohio St.2d 84, 86 (1972). "The subsequent passage of the Ohio Workers' Compensation Act, which protected covered employers from damage suits brought by employees injured on the job, rendered these statutes largely obsolete." *Id.* at 433, citing *Ford Motor Co. v. Tomlinson*, 229 F.2d 873, 879 (6th Cir. 1956). "They continue to be used, however, by injured employees of subcontractors who seek damages, in addition to workers' compensation benefits, from

the property owners, or contractors in privity with their employers, who fail to keep the property safe from hazards for 'frequenters.' " *Id.*

{¶ 53} "The duty owed to frequenters, i.e., including employees of other companies, is no more than a codification of the common-law duty owed by an owner or occupier of premises to invitees, requiring that the premises be kept in a reasonably safe condition, and that warning be given of dangers of which he has knowledge." *Eicher v. U.S. Steel Corp.*, 32 Ohio St.3d 248, 249 (1987), citing *Westwood* at paragraph one of the syllabus. "However, the duty to frequenters of places of employment, as set forth in R.C. 4101.11, does not extend to hazards which are inherently and necessarily present because of the nature of the work performed, where the frequenter is the employee of an independent contractor." *Id.* A construction site is an inherently dangerous setting. *Bond v. Howard Corp.*, 72 Ohio St.3d 332, 336 (1995). "[A] subcontractor who works at a construction site is engaged in inherently dangerous work." *Michaels v. Ford Motor Co.*, 72 Ohio St.3d 475, 479, fn. 4 (1995), citing *Bond* at 334.

{¶ 54} "One who engages the services of an independent contractor, and who actually participates in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, can be held responsible for the injury or death of an employee of the independent contractor." *Hirschbach v. Cincinnati Gas & Elec.*, 6 Ohio St.3d 206 (1983), syllabus. Active participation "means that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury." *Bond* at 337. "A general contractor who has not actively

participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work." *Cafferkey v. Turner Constr. Co.*, 21 Ohio St.3d 110 (1986), syllabus. Thus, active participation means more than supervising or coordinating. *Id.* The employer must exercise control over the work activities or retain control over a critical variable in the workplace before it can be held liable to the independent contractor's employees. *Sopkovich v. Ohio Edison Co.*, 81 Ohio St.3d 628, 643 (1998). The Ohio Supreme Court has summarized its general analysis as follows:

As is evident from our cases, when determining if a duty of care is owed pursuant to the frequenter statutes, the legal test is the same for owners and general contractors: Did the party have custody or control of the injured employee, the employment, or the place of employment? The answer to this question obviously depends upon the specific circumstances of each case, not the general status of the parties.

*Michaels* at 478, fn. 3.

{¶ 55} Based on our review of the evidence of record, including the deposition testimony summarized above, we conclude that the trial court did not err in granting summary judgment in favor of Vinyl & Carpet on Badra-Muniz's negligence claims that were based on premises liability law. There was no evidence that Vinyl & Carpet had custody or control of the injured employee, the employment, or the place of employment. *Id.* Badra-Muniz was the employee of the general contractor. Vinyl & Carpet was a subcontractor that had no control over Badra-Muniz or his employment. Further, no

evidence was presented that Vinyl & Carpet had control over the place of Badra-Muniz's employment. While Badra-Muniz argues that Dixon had control over the area where Badra-Muniz was injured, he presented no evidence that Vinyl & Carpet actively participated in any control that Dixon was exercising over that area at the time of the injury. As we explained in our resolution of the second assignment of error, Badra-Muniz cannot establish liability under a respondeat superior theory because Dixon was dismissed from the lawsuit based on the expiration of the statute of limitations. The Ohio Supreme Court stressed in its *Wuerth* decision that the rule that a principal is vicariously liable only when an agent could be held directly liable applies not only to claims of respondeat superior but also to other types of vicarious liability. *Wuerth*, 2009-Ohio-3601, at ¶ 23.

{¶ 56} The record also contains no evidence establishing the necessary privity between Badra-Muniz's employer and Vinyl & Carpet. *See Kucharski*, 69 Ohio St.3d at 433. We also note that the factual scenarios involving the frequenter statutes typically involve an employee of a subcontractor who sued the general contractor or owner of the building where the construction project was being completed. In those instances, an argument can be made that the general contractor or owner exercised some control over the work of the subcontractor and the place of employment. Such control seems to be inherently lacking in the instant case where an employee of a general contractor sued a subcontractor. Typically, a subcontractor has much less control (if any) over the construction area and the general contractor's employees than the owner of the building or the general contractor does. Although Dixon testified in this case that the employees

of the various subcontractors appeared more experienced than Badra-Muniz, this in no way created a genuine issue as to whether Vinyl & Carpet exercised any active control over Badra-Muniz's employment or place of employment. Finally, the Ohio Supreme Court has made it clear that the duty to frequenters does not typically extend to situations involving hazards that are inherently and necessarily present, like those present at a construction site.

{¶ 57} The trial court did not err in granting summary judgment to Vinyl & Carpet on Badra-Muniz's negligence claims. The third assignment of error is overruled.


V. Conclusion

{¶ 58} Having overruled all of the assignment of errors, we will affirm the judgment of the trial court.

. . . . . . . . . . . . .


EPLEY, P.J. and HUFFMAN, J., concur.